and make a finding that their decision was against the manifest way of the evidence. My client was injured the first day that he started work with Respondent as a laborer. He was assigned for the first four hours of his shift to basically feed rebar, which is 20-foot pieces of steel, into a machine repetitively. And he was then assigned to pull stakes out of a section of concrete that had been poured the previous day. And that's a key fact when it comes to the issue of accident, which I will get to. Basically, this required him to rock the pins back and forth to try and pull them out since the concrete was drying, having been poured the previous day. As he was... Hold on, hold on. I think the critical question, is it not? Can you address it? There seems to be, as I'm reading the commission's decision, the arbitrator's decision, there seems to be an issue about the credibility of your client. Correct. Issue about testimony was contradicted by two other witnesses. Issue about whether or not he had previous back problems that hadn't been disclosed. It appears that given the inconsistencies in his testimony, the commission seemed to find he wasn't credible. How do you respond to that? Well, I believe that there's several other pieces of evidence that corroborate the Petitioner's version of events. Mainly, the history that he gives to all of the medical providers involved here. The first being the emergency room. He tells them that he fell at work. The second is Dr. Darling, who he told he fell at work. Dr. Eller, who ended up being his neurosurgeon and the surgeon that performed his 2005 surgery. The physical therapy records.  The third piece of evidence, which is the testimony of the independent witness, Antonio Lasoya, who testified having no stake either way the case would turn out, that he physically saw Petitioner fall in the same manner that Petitioner testified that he fell. I'm assuming for the sake of the argument, is it worth it that that's true? You've got the testimony of Lasoya and Jacobson granting. You've got Antiveros, who was there. You've got Heisel. So, in essence, what you're framing is a question of credibility, which traditionally is the matter that is to be resolved by the commission. So the commission resolves the credibility, the weight and the inconsistencies. So how do you end up saying that the decision then is against the manifest ways if it's a credibility question? Well, I believe that these pieces of evidence that I just mentioned support Petitioner's version of events. The fact that he had prior back problems and didn't tell Respondents IME about them is one factor. With respect to his prior back problems, there's no evidence that he was unable to work at any time prior to July of 2004. There's also no evidence that there was ever a surgical recommendation before that time. And there's further no evidence that he had anything more than conservative treatment when he treated with Dr. Darling prior to the July 2004 injury. Dr. Darling even prescribed a lumbar spine MRI in 2002, which showed no real changes. There was some degenerative changes, but nothing remarkable, according to the reader of the MRI. So we basically have a before and after MRI, the after showing a herniated disc, with an independent witness saying that he fell as he said he did. And a very consistent history to every medical provider that he fell at work while pulling a stake out of concrete. Let's go back to his version of the events. The evidence is, is it not, that when he pulled out the pin, he fell backwards and he landed in fresh cement. And yet there's no impression whatsoever in the cement. The Petitioner did not testify that it was fresh cement. Both the Petitioner and Antonio Lasoya testified that the area that they were pulling the pins out was cement that had been poured the previous day. And because it had dried to some degree, that's why they were pulling the pins out of it. So our contention is that there would not have been an impression made since the concrete had been poured the day before. And as I mentioned, Antonio Lasoya, again, the only independent witness that testified at trial, testified that this was a separate section than the concrete that they had poured that morning, for which they put plastic over it because it was still drying and it started to rain. So the issue of the impression is really the only basis that the arbitrator mentions for denying the accident, is because there was no impression made in the concrete. And I would submit that based on the testimony of the independent witness, Mr. Lasoya, in addition to the Petitioner, that that's a misunderstanding of the facts and testimony in the case. This was a separate area that had already dried for 24 hours and therefore an impression would not have been made. Did Mr. Romer help you? I'm sorry? Did Mr. Romer, did he help your case? Mr. Romer, would that be Mr. Jacobson, Radar Jacobson? Well, no, he was saved for private investigators. Oh, the surveillance footage. The surveillance footage only showed, I believe, 24 minutes of footage over a seven-day period that they surveilled my client. He's really shown doing nothing more than walking on his cell phone. You know, certainly when it comes to lumbar spine conditions or any medical malady, there can be good and bad days. We don't know how much medication he took that day. The fact of the matter is that we have two doctors here, Dr. Darling and the neurosurgeon, chief of neurosurgery at Rockford Memorial Hospital, Dr. Eller, saying that this gentleman is totally and permanently disabled as a result of the herniated disc, which was caused by the work injury, as he stated to every medical provider that he saw. And I would submit to the court that Dr. Darling is really in the best position to opine as to the petitioner's before-and-after condition, since he did treat him from 2001 and then beyond the 2004 accident date. So he knows what he was like before, and he knows what his post-accident condition was, and still testifies that the condition had changed, the condition had worsened, and that prior to 2004, there was some conservative treatment that he was on. And he testified that there was some conservative treatment that had been done. After 2004, he has a surgical operation and is now medically totally and permanently disabled per the testimony of two doctors. And Soriano says the opposite, correct? Correct. Dr. Soriano, who testified that he does 100% of his work for defendants and has never heard of a petitioner or a plaintiff hiring an IME. So I believe when it comes to credibility, his credibility should also be questioned. And again, for the commission and the arbitrator to adopt Dr. Soriano, who saw the petitioner one time, over that of Dr. Darling, who had a several-year before-and-after treatment and experience with the petitioner and continued to give the medical total firm, you know, evaluation and causal connection opinion at his deposition, I believe that that's against the manifest way to the evidence. Before you move on to your next point, a final question. Here's the theme that I'm getting from your argument. You've got conflicting testimony of the witnesses as to the facts of the accident. You say we should believe the claimant's witnesses. You've got conflicting medical testimony, granted. How do you respond to the charge that if we went along with your argument, we would be substituting our judgment for that of the commission? Well, Your Honor, I believe that there are several pieces of evidence here that were never addressed by the commission. The commission's decision, upon its own decision, was that there should be a medical testimony. And I believe that the arbitrator's decision is fundamentally flawed because of the misunderstanding of the concrete evidence and the fact that the arbitrator specifically states that the only reason he found no accident occurred was because there was no impression of a medical testimony. And We have an independent witness saying that he witnessed the accident, which is consistent with what the petitioner testified to, and we have the petitioner giving all of his medical providers the same consistent version of events as to how this accident happened. And we have no herniated disc and ability to work a heavy laborer's job prior to July 21st, 2004. After July 21st, 2004, we have a very, a failed surgery, and we have no herniated disc and ability to work a heavy laborer's job prior to July 21st, 2004. And we have an inability to work in any capacity. And I believe that the evidence that I just described is against the manifest weight for the arbitrator to find that no accident occurred based on the misunderstanding of the issue of the concrete. Are there any other points you'd like to address besides the manifest weight? I'd like to briefly address the average weekly wage issue. Obviously, the issue of accident is — And that would trump that if we, obviously, uphold it. Correct. The issue of the average weekly wage, the arbitrator found the average weekly wage to be $99. Petitioner testified unrebutted that his wages were $22 per hour. That morning he had worked about four to five hours. So my understanding is that the arbitrator multiplied that times 22, and that's where we get the $99 average weekly wage from. It's true that my coworker did not include any evidence of a like employee. However, we had testimony of a like employee. And we would submit to the court that the fourth version under Sylvester should be used to calculate the average weekly wage. Certainly, it's ludicrous to think that he would only work those four hours per day for the entire week and that that's what the average weekly wage should be based on. Rodney Hazell, also known as Rudy, testified that the laborers would often work about 10 to 12 hours per day on average. So if we use that number combined with the $22 per hour that petitioner testified is unrebutted as to what he was making, the suggestion would be an $880 average weekly wage, which would just be 22 times 40. So obviously, with the issue of accident being, you know, trumping the average weekly wage, we also believe was an error. And flowing from the issue of accident, the client, the petitioner had surgery. He was off work from the date of surgery. Currently, he was never returned to work. I'm sorry, from the date of accident currently. So we believe TTD should be awarded medical expenses. To briefly address the issue of other employment, there was some evidence that respondents suggested that the client was working selling siding. However, we presented evidence that he was never employed by Blackhawk Siding. He never received any type of payment or commission. He was never considered an employee of Blackhawk Siding. Thank you, Counsel. We'll have time on rebuttal. Counsel, please. Good morning, Your Honors. Daniel Egan on behalf of the Employer Alliance Corporation. We filed a cross-appeal on this matter, contesting the jurisdiction of the court system to even hear this matter. Before I get to that, I want to address a couple things while it's still fresh in our minds regarding counsel's initial argument. This is a credibility case. That's what it boils down to. The arbitrator, the commission, did not believe the petitioner and the petitioner's witnesses. One of the key points that I have to disagree with counsel on was that she testified, the petitioner, Mr. Grucheska, testified that he fell on concrete that had been poured the day before. Well, that's not true. He said that it was poured that morning. I can cite to the record for you, it is C, pages 119 and also pages 173 and 174. At page C119, it was during direct exam of petitioner. 173 and 174, it was during cross-exam. So we have a conflict between the independent witness Lasoya and Grucheska as to when the concrete was poured. We have numerous conflicts as to his medical history, as Your Honors saw in the decision and in the records of Dr. Darland prior to this accident and even the information that Mr. Grucheska provided us before he started. Simply put, it's a manifest weight case. There's evidence of record to support the commission's decision. As Your Honors pointed out, you would be substituting your basis for deciding this as opposed to the commission. And I think case law is clear. In a manifest weight case, deference, great deference is given to the commission and their conclusions. I would therefore urge that the decision be affirmed in full. However, I am troubled by the jurisdiction of the court, and we filed a cross-appeal as to that issue. The record is clear as to when petitioner received the decision of the commission. I believe that was April 20th. The record is also clear when the decision was filed in the or the appeal was filed in the circuit court of DeKalb County. That was May 14th. That's the first indication of any interaction between the circuit court clerk's office in DeKalb County and petitioner's office. There's no Federal Express information as to when the documents appeared in DeKalb County. There's no independent clerk testimony as to when the documents appeared. The first time that something occurs is May 14th, which is well after 20 days. However, there's a proof of mailing that they were mailed in the 20-day period, correct? There's proof that it was mailed within 20 days. But again, this is akin to filing a complaint. Well, I guess the real issue is, for us to decide, is does the mailbox rule apply to an appeal from the commission decision to the circuit court? If it doesn't, why not? If it doesn't, well, it hasn't been thus far. Secondly, I believe it's the Rojas case indicates that you can't even put your appeal documents in the no-fee filing box that was in the suburban Cook County districts and have that be sufficient. I don't think Rojas decided that issue. I'm sorry? I don't think Rojas decided that issue. I think Rojas mentioned that issue. Mentioned that issue. However, that was unnecessary. There was also a summons that was issued late. But the documents were not on file. The 20 days is akin to a statute of limitations. But what about other decisions of this Court that hold the mailbox rule was applicable to the filing of jurisdictional documents in appeal? Doesn't the mailbox rule apply to the filing of a petition for review from the arbitrator to the commission? There is a specific rule at the commission that says 2 to 3 days before the date of the due date of a petition for review is sufficient for a petition to review to be deemed filed. However, this Court has also said, well, the appellate court, I should say, not your honors or the industrial commission division. In the McReynolds case, you had to comply with all the rules, the local rules of the circuit court before it could be deemed filed. You had to show that the clerk had the documents, even if they were late or not filed untimely, to be deemed filed. We have no evidence as to when these were. But the issue is you have other decisions. You've got a notice of appeal. There's case law that says a notice of appeal filed in the circuit court to prosecute an appeal to the appellate court is deemed filed on the date of mailing, correct? Yes, but that's different than the initiation of a lawsuit, which this is. Well, give us a policy reason. And this is a case of first impression. I think we can all agree upon that. What is the policy reason that would weigh against the mailbox rule applying in this circumstance? Well, right now we don't even know when first-class delivery is going to be guaranteed. Is that because of what happened the last few days? Yes. Do you want to take judicial notice of the newscasts or what? We, as the employer or as the appellee, need some assurance that an appeal is filed. For someone to say that the documents are in the mail and they never appear, how are we to know when they appear or if they appear timely? We need some assurance as to the due dates. I see your point. Certainty, of course, with file stamped is the way to go. But should a case turn on, it's not inconceivable, is it, that something could be filed in the clerk's office and maybe get misplaced and lay there for days? Somebody loses the right of compensation, perhaps on a permanent total, because somebody misplaced a document? Isn't the idea to get this right? Well, the idea is to get it right. But there's, in other cases, there has been testimony from the clerk's office indicating that, yes, we had the documents in time. And there were ways to ensure that these were filed on a timely basis. These were thrown in the mail. They could have been sent by Federal Express. The attorney could have gone personally to the courthouse and filed them. In other words, simply putting it in the mail and then saying, oh, we filed it, and there's no information, no documentation, no evidence that they ever even bothered to follow up within the 20-day period, their representation in the briefs is the first time we knew there was a problem was on May 14th. So your position is clear and it's absolute, unless and until it's file stamped by the clerk. That's the date that controls? Unless you have some other mitigating circumstance. And there's been such where the clerk has said, well, we received it at 4.30 in the  We're busy. We didn't file it until the next day. Okay. If we had that information in this case, I could understand that. We don't have that information in this case. We have no information as to when it was in the clerk's hands to be filed. Was it there timely? I don't know. Is what was represented accurate? I assume it was. I don't wish to cast dispersions on counsel or her firm. But we don't know that that's actually accurate. We can assume that. But how come that's the only place it didn't show up? I don't know. What we do know is that if it were in the clerk's office and there were a file stamp or a date stamp or, you know, a received stamp or a clerk that said, you know what, geez, we got it on May 8th, and we didn't file it until May 14th. Okay. It's on the clerk's office then. But presupposing the clerk's office in these cases would even know what happened to the documents? They're supposed to know what happens with the documents. Again, there are other ways than mailing it to make sure that it's there and to have a paper trail. And there is no paper trail in this case. Well, there are unrebutted affidavits. There are no affidavits in this case. I guess I didn't hear your question. Well, didn't an attorney and a staff person? Oh, as to proof of mailing, yes. As to the proof of mailing. I misunderstood. And those are unrebutted. I mean, there's really no dispute that they were mailed timely under those affidavits. I assume that they were mailed on time. But we don't know when they were received. I thought you were asking if there was an affidavit from the circuit clerk's office. There were cases that Your Honor has heard just last month. To a recent decision that we made. Yes. Yes. Where there was evidence by the clerk himself as to when it got received. Yes. And that came out I think last month and is a Rule 23 decision, which our briefs were on file. And obviously it's a Rule 23 decision. I would not cite to Your Honor's. But just last month there was evidence of documents being in the clerk's office. And I can accept that. What I have trouble with is saying that we mailed something, we didn't follow up within the 20-day period, we didn't know that there was a problem until May 14th when the circuit clerk called us and said, we need this other form filled out. Not even the local rules were complied with within a 20-day period. And I find that troubling. Well, the 20-day period is you must, to perfect or to commence, you have to begin this process within 20 days. I think it has to be filed within 20 days. Well, now we're dealing with the issue of what is filing, what's proper filing. That's a different issue over there. But if we're talking about policy, we have a short period, a window of time for you to begin commencing, correct? Correct. 20 days as opposed to 30 days in a lot of other instances in the practice of law. Correct. This is a special and unique time period. And the theory presumably being that we want no real delay as in other lawsuits. Correct. We want this to fast track, so to speak. Yet you can show up at the courthouse by a minute before closing on the 20th day and still be within the 20-day beginning time process. Certainly. Right? From the standpoint of mailing on the 20th day, if there were a mailbox rule, how much time is really lost? Assuming normal delivery and, again, yet all of those other things don't happen. Setting aside. Because we also find, you know, that there are cracks in the desks of some clerk's offices, too, that things fall through every once in a while. How much time is really lost? Yes. The bottom line is and what you're asking is there isn't anything that is lost other than the employers or the appellees, I should say. I'm the employer. That's why I say that. But the appellee's certainty that this was not, that this was timely initiated, and that's something that needs to be taken into consideration as well. And if there were some, if this were the only way, you know, throwing it in the mail was the only, you know, only way that you could ensure, short of showing up, that you could get it there, I can see that. But you can Federal express things. My own personal way of dealing with all the different jurisdictions I appear for in filing things in the circuit court is I send things by Federal express or next day delivery, what have you, whatever company you want to use, so that I know when it's there. And that if by chance it doesn't get filed, I can say, well, I spoke with Clerk Smith, and he told me that it was there, and here's the tracking number, so I can present documentation. Here we don't even have any information showing there was an effort to make sure this was filed in the courthouse within 20 days. Thank you, counsel. To return to the other argument, I think it's a manifest weight argument, and I would like to address the issue of subject matter jurisdiction. We do have the affidavit of the secretary from our office, Corrine Berg, stating that she did mail the appeal documents well within the 20-day time limit for filing a circuit court appeal. The decision was received on 4-20. The documents were mailed 5-4 to the DeKalb County Circuit Clerk. They were also mailed the same day and stated in Ms. Berg's affidavit to the commission, and we know that it made it to the commission because we have a file stamp receipt for preparation of the record dated 5-8. So I believe that it can be reasonably inferred that since Ms. Berg testified that she sent those on the same day, that they were also sent to the DeKalb County Circuit Clerk and should have been received on or about that time. I have a question. Why should we adopt the mailbox rule, though? I believe that in this day and age where many of us practice in multiple counties all around the state, it's not practical to, as counsel suggested, make the appellant drive to these counties and actually hand the paperwork to the clerks. They don't have to drive overnight. There's other mechanisms for getting it there within a day, isn't there? There is, Your Honor. But, you know, I believe a tracking number from a FedEx is essentially the same thing as a proof of mailing. I mean, that just proves that it was mailed. We don't know what happens to it when it gets there. We can't, you know, force the Circuit Clerk's office to stamp the paperwork and, you know, things happen when documents are sent into governmental offices that we don't have control over. Has the mailbox rule ever been adopted for the commencement of original actions in the Circuit Court? Some of the cases that we cited in our reply brief, Harrisburg talks about the mailbox rule, stating that when the documents are under the care and control of the Circuit Court, that that's essentially the same as being filed. Let me talk about it. I'm sorry? That's not my question. My question was, has any case ever adopted the mailbox rule for the filing of an original action in the Circuit Court? Not that I can specifically cite to, Your Honor. As I mentioned, the Harrisburg case, in addition to the Jones case, which is a Supreme Court case, which talks about substantial compliance with the appeal rules and how the Court found that substantial compliance was akin to, you know, accepting that the appeal had been filed in a timely manner. And also the Forest Preserve case cited in our brief also kind of echoes the substantial compliance issue. And we would submit to the Court that the documents were filed within the 20, were commenced, were sent to the Circuit Court within the 20-day time period, and that that should be acceptable, substantial compliance in accord with the Commission's rules on filing an appeal. And I believe that it's within the spirit of the Act to allow the mailbox rule to apply, that someone should not be, you know, prevented from having their appeal heard by the Circuit Court or this Court simply because of an error at the Circuit Clerk's office. As soon as we were notified that a new case information sheet had to be filled out, that was returned immediately the same day to the Clerk's office, and they actually stamped the documents. So I believe that this Court does have subject matter jurisdiction for those reasons. To briefly address the issue of accident again, I would point the Court to C-118, where the petitioner was specifically asked, was the area that you were pulling the pins out of the same area that you had covered with plastic to prevent it from being damaged by the rain? And he says, no, sir. And I would again point to the independent witness's testimony that the area where he was pulling the pins was separate and apart from the area of concrete that had been poured that morning. The reason that the pins were being taken out was because it had dried. And again, that was because it had been poured the previous day. So the sole basis for the arbitrators and therefore the Commission's reason for denying accident was because there was no impression, and that's factually inaccurate. There would not have been an impression because this was concrete that had been poured the previous day. So I would ask that you find the Commission's decision to be against the manifest weight of the evidence and reverse on all issues. Thank you. Thank you. The Court will take the matter under advisement for disposition.